Michael and Melissa MARKOVICH,
parents of Ashlyn M. Markovich,
Petitioners,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 03–2015V.

United States Court of Federal Claims.

Oct. 31, 2005.

Mark L. Krueger, Greenhalgh Krueger Hernandez & Fasi, S.C., Baraboo, Wisconsin, for Petitioners.

Traci R. Patton, United States Department of Justice, Washington, D.C., for Respondent.

## MEMORANDUM OPINION

BRADEN, Judge.

On July 22, 2005, a Special Master of the United States Court of Federal Claims ("the Special Master") issued an unpublished decision finding that Petitioners did not file a

claim for relief under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa–1 to –34 (2000 & Supp. II 2003), ("Vaccine Act") within the three-year statute of limitations and, therefore, the United States Court of Federal Claims did not have jurisdiction to reach the merits of this case. *See Markovich v. Sec'y Dep't of Health & Human Servs.*, No. 03–2015V, slip op. (Fed.Cl.Spec.Mstr. July 22, 2005) ("*Markovich*").

On August 19, 2005, Petitioners filed a Motion for Review challenging the Special Master's decision. On September 19, 2005, the Government filed a Response. The court has issued this Memorandum Opinion on an expedited basis to facilitate any appellate review that Petitioners may decide to pursue.

## RELEVANT FACTS [1]

Ashlyn Markovich ("Ashlyn") was born on May 12, 2000 to Melissa and Michael Markovich. *See Markovich*, at 4 (Pet. Ex. 1 at 1). On July 10, 2000, Ashlyn received Diphtheria, Tetanus, and Acellular Pertussis ("DTaP"), Inactivated Polio Virus ("IPV"), and *Haemophilus influenzae* type B ("Hib") vaccinations. *Id.* at 1. On July 10, 2000, Ashlyn also experienced a repeated eye blinking episode.[2] *Id.* at 2, 14 (Pet. ¶ 3; Aff. ¶ 4). Ashlyn's eye blinking episodes continued until August 30, 2000, when she was admitted to Fairview Ridges Hospital in Burnsville, Minnesota ("Fairview Ridges Hospital") and diagnosed with a seizure, but the cause was not identified. *Id.* at 2–3, 5 (Pet. Ex. 18 at 5; Pet. Ex. 14 at 30).

On September 8, 2000, Ashlyn had a routine examination, during which her pediatrician, Dr. Tiffani Mullins, was advised of Ashlyn's seizure, but, nevertheless, found Ashlyn normal. *Id.* at 5 (Pet. Ex. 4 at 5). On September 14, October 11, 14, 18, 20, 21, and 22, 2000, however, Ashlyn experienced other seizures. *Id.*

On October 16, 2000, Dr. Ronald H. Spiegel, a Pediatric Neurologist at St. Paul Children's Hospital in St. Paul, Minnesota ("Children's Hospital"), examined Ashlyn and prescribed Tegretol, an antiseizure medication, which she began taking on October 21, 2000. *Id.* (Pet. Ex. 6 at 210; Pet. Ex. 16 at 45–46). On October 22, 2000, Ashlyn again was admitted to Children's Hospital, at which time the Tegretol was discontinued and another series of tests was performed. *Id.* at 5 (Pet. Ex. 6 at 159–63). On November 9, 2000, Ashlyn had a follow-up examination with Dr. Spiegel. *Id.* at 6 (Pet. Ex. 16 at 44). On November 17, 2000, Ashlyn experienced another seizure and again was taken to Fairview Ridges Hospital. *Id.* (Pet. Ex. 14 at 23–26; Pet. Ex. 18 at 12). She was treated and discharged on November 20, 2000. *Id.* (Pet. Ex. 16 at 4–5).

On January 8, 2001, Ashlyn returned to Fairview Ridges Hospital and was diagnosed as having experienced a seizure. *Id.* (Pet. Ex. 14 at 17–19). After two to three weeks of coughing, congestion, and fevers, Ashlyn was examined by Dr. Mullins on January 25, 2001. *Id.* (Pet. Ex. 4 at 9). Ashlyn was diagnosed with a prolonged upper respiratory infection and probable acute bronchitis. *Id.* Later that same day, however, Ashlyn again was admitted to Fairview Ridges Hospital and diagnosed as having experienced a seizure. *Id.* (Pet. Ex. 14 at 14–16). On January 29, 2001, Ashlyn had a follow-up visit with Dr. Spiegel, who reported that Ashlyn was developing well, notwithstanding the seizure episodes. *Id.* (Pet. Ex. 16 at 41–42).

On March 3, 29, April 2, 3, 17, June 8, and July 10, 2001, Ashlyn experienced additional seizures. *Id.* at 6–7 (Pet. Ex. 5 at 89–91, 99–100; Pet. Ex. 6 at 210; Pet. Ex. 14 at 4–7; Pet. Ex. 18 at 19; Pet. Ex. 19 at 2). Following the July 10, 2001 seizure, Ashlyn was admitted to St. Francis Regional Medical Center, in Shakopee, Minnesota ("St.Fran-

---

1. The relevant facts recited herein are summarized from factual findings found in *Markovich*, at 1–13. Citations to the record are noted as follows: "Pet. ¶ ___" refers to the August 29, 2003 Petition; "Pet. Ex. ___ at ___" refers to Petitioners' exhibits; "Aff. ¶ ___" refers to the Affidavit of Melissa Markovich; and "TR at ___" refers to the transcript of the November 5, 2004 hearing before the Special Master.

2. Ashlyn's parents noticed the repeated eye blinking, but assumed that she was tired. *See Markovich*, at 2, 14 (Pet. ¶ 3; Aff. ¶ 4).

cis"), and underwent blood tests that indicated a mildly elevated white blood cell count. *Id.* at 7 (Pet. Ex. 5 at 90–91). Ashlyn was discharged on that date, against medical advice. *Id.* (Pet. Ex. 5 at 91).

On July 12, 2001, Ashlyn received a neurological assessment from Dr. Steven Janousek of the Noran Neurological Clinic, in Minneapolis, Minnesota. *Id.* (Pet. Ex. 7 at 71–72). From July 18, 2001 to April 26, 2002, Ashlyn's mother frequently contacted Dr. Janousek to advise him of Ashlyn's condition and request advice about seizure management. *Id.* (Pet.Ex. 7). On July 23, 2001, Ashlyn had a urine analysis that indicated that her organic acid pattern screen was not consistent with that of a known excess of acid, her urine amino acid pattern was not consistent with a known disorder of amino acid metabolism, but an oligosaccharides screen was normal. *Id.* at 7–8 (Pet. Ex. 5 at 34–36).

On July 17, 31, August 11, and 24, 2001, Ashlyn experienced additional seizures. *Id.* at 7–8 (Pet. Ex. 5 at 31–32, 85–88, 92–93, 97; Pet. Ex. 18 at 31). On August 28, 2001, Ashlyn was re-examined by Dr. Janousek. *Id.* at 8 (Pet. Ex. 7 at 58). On September 10, 2001, Ashlyn was admitted to the Pediatric Epilepsy Ward at Children's Hospital to start a ketogenic diet.[3] *Id.* (Pet. Ex. 6 at 202–206, 209–213, 216). During this time, Ashlyn also was evaluated by the Speech Pathology Department, which determined that Ashlyn had a mild receptive and expressive language delay. *Id.* (Pet. Ex. 6 at 89).

On September 13, 2001, Ashlyn was discharged from Children's Hospital, but on September 17, October 5, 15, and November 8, 2001, Ashlyn experienced additional seizures and was taken to St. Francis. *Id.* at 8–9 (Pet. Ex. 6 at 202–205; Pet. Ex. 5 at 79–84; Pet. Ex. 18 at 24).

On December 7, 2001, Ashlyn was taken to St. Francis, where her mother observed a cluster of seizure activity. *Id.* at 9 (Pet. Ex. 5 at 75–76). Later that afternoon, Ashlyn again was taken to the hospital with seizure activity. *Id.* Shortly after her second discharge, Ashlyn returned with a recurrence of seizure activity. *Id.*

On December 26, 2001, Ashlyn was admitted to Children's Hospital for a prolonged evaluation. *Id.* (Pet. Ex. 6 at 193–196). During this evaluation, Dr. Michael D. Frost noted that despite being treated with multiple anticonvulsant medications and the ketogenic diet, Ashlyn still was experiencing daily seizures. *Id.* Ashlyn was diagnosed with: intractable epilepsy, partial tonic seizures,[4] complex-partial secondary generalized seizures, a history of status epilepticus, and a history of Todd's paralysis.[5] *Id.* at 10 (Pet. Ex. 6 at 196). On January 11, 2002, Ashlyn was released with changes to her medication regimen. *Id.* at 9–10 (Pet. Ex. 6 at 194–196); *see also* Pet. Ex. 6 at 256–257 (listing the prescribed antiepileptic medications). Before the day was over, Ashlyn was returned to St. Francis and diagnosed as having experienced a seizure. *Id.* at 10 (Pet. Ex. 5 at 68).

On January 29, 2002, Ashlyn was admitted to the Mayo Clinic by Dr. Jeffrey R. Buchhalter "to determine whether a single focus of seizure onset is likely that would be susceptible to surgical removal." *Id.* (Pet. Ex. 15 at 8) (internal quotations omitted). During that evaluation, a Neurologist, Dr. Randa G. Jarrar, diagnosed Ashlyn as having experienced four types of seizures: (1) repeated

---

3. A ketogenic diet is a:
   stringent, mathematically calculated diet high in fat and low in protein and carbohydrates that, when followed conscientiously, produces a by-product called ketones in patients' blood and urine. High concentrations of ketones in the body control the frequency and severity of a seizures, although the biochemical mechanisms for this phenomenon are not yet known. The Ketogenic Diet, *The Epilepsy & Brain Mapping Program, at* http://www.epipro.com/k_diet.html (last visited October 31, 2005) (cited by *Markovich,* at 8 n. 19).

4. Tonic seizure is "characterized by a sustained increase in muscular tone, of abrupt or gradual onset and offset, lasting a few seconds to a minute," usually ten to twenty seconds. STEDMAN'S MEDICAL DICTIONARY 1615 (27th ed.2000).

5. Todd's paralysis is defined as: "hemiparesis or monoparesis lasting for a few minutes or hours, or occasionally for several days, after an epileptic seizure[.]" DORLAND'S MEDICAL DICTIONARY 1366 (30th ed. 2003) ("DORLAND'S").

eye blinking; (2) clonic movement[6] of the face, arm, and leg; (3) generalized seizures with or without focal onset; and (4) partial motor seizures. *Id.* (Pet. Ex. 15 at 12). This appears to be the first medical diagnosis that identified Ashlyn's July 10, 2000 eye blinking episode as a seizure. Dr. Buchhalter observed evidence of "multifocal epileptogenic abnormalities," however, surgical intervention was not recommended. *Id.* at 10–11 (Pet. Ex. 15 at 2–3, 14, 20).

On February 17, 22, March 17, and April 5, 2000, Ashlyn continued to experience seizures, requiring readmission to St. Francis. *Id.* at 11 (Pet. Ex. 5 at 52–55, 64–67). On April 9, 2002, Dr. Patricia E. Penovich of the Minnesota Epilepsy Group recommended that a vagus nerve stimulator ("VNS") be implanted in Ashlyn.[7] *Id.* (Pet. Ex. 6 at 242).

On April 16, 2002, Ashlyn was admitted to Children's Hospital for tests that " 'strongly suggested a frontal onset to seizures.' " *Id.* (quoting Pet. Ex. 7 at 128). On April 29, 2002, Ashlyn experienced another seizure and was taken to St. Francis. *Id.* (Pet. Ex. 5 at 48–49). After being released, Ashlyn experienced a one-and-a-half hour seizure that her mother promptly reported to the hospital. *Id.* (Pet. Ex. 6 at 5).

On October 8, 2002, Ashlyn was examined to prepare for the implantation of a VNS. *Id.* (Pet. Ex. 6 at 181–184). On October 10, 2002, Dr. Mary E. Dunn implanted the VNS. *Id.* (Pet. Ex. 6 at 178–180). In the months following the implantation, however, there was little to no improvement in seizure frequency and intensity. *Id.* (Pet. Ex. at 6 at 165–171).

On January 3, 2002, Ashlyn received a speech and language evaluation by Ms. Mi-

chelle Laurent at St. Francis Rehabilitative Service. *Id.* (Pet. Ex. 5 at 43–45). After observing significant speech and language delays, Ms. Laurent recommended that Ashlyn receive therapy for slow development. *Id.* (Pet. Ex. 5 at 44).

On February 2, April 25, and June 19, 2003, Ashlyn experienced additional seizures. *Id.* at 12–13 (Pet. Ex. 5 at 37–42).

## PROCEDURAL BACKGROUND

On August 29, 2003, Michael and Melissa Markovich, the parents of Ashlyn Markovich, ("Petitioners") filed a Petition for Compensation under the Vaccine Act ("the Petition"), alleging that Ashlyn's seizure disorder and intractable epilepsy were caused by the DtaP, IPV, and/or HiB vaccines that Ashlyn received on July 10, 2000. *Id.* at 2. In support, Petitioners submitted Ashlyn's medical records, Ms. Markovich's Affidavit ("the Markovich Affidavit"), expert Affidavits of Dr. Frank J. Ritter (Pet.Ex. 12) and Dr. Donald H. Marks (Pet.Ex. 17), and an expert report from Dr. Jean–Ronel Corbier (Pet.Ex. 20).

At a January 27, 2004 status conference, the Special Master indicated that an Onset Hearing with expert testimony was necessary, because the Petition and the Markovich Affidavit raised statute of limitations concerns. *See Markovich*, at 4; *see also* Pet. ¶ 3; Aff. ¶ 4. On June 2, 2004, Petitioners filed the expert report of Dr. Corbier, a Pediatric Neurologist. *See Markovich*, at 4. On November 5, 2004, the Special Master conducted an Onset Hearing in Washington, D.C., at which Dr. Corbier testified. *Id.* The Government declined to proffer an expert witness to interpret the significance of Ash-

---

6. Clonic movement is characterized by: "alternate muscular contraction and relaxation in rapid succession[.]" DORLAND's at 377.

7. The vagus nerve is:

one of the primary communication lines from the major organs of the body to the neck to the vagus nerve. Stimulation of the vagus nerve can stop seizures, reduce the intensity and frequency of seizures in some patients. The VNS periodically stimulates the vagus nerve, usually for a brief period.

The VNS is an implanted pacemaker-size stimulator. It has a wire lead that attaches to the vagus nerve by means of an incision. The incision is made on a naturally occurring crease on the neck, thereby making the healed scar practically invisible. The procedure takes a few hours and the patient is usually released from the hospital on the next day. After the patient stabilizes, the physician uses a wand to activate the VNS.

Treatment: Vagus Nerve Stimulator, *The Epilepsy & Brain Mapping Program, at* http://www.epipro.com/vns.html (last visited October 31, 2005) (cited by *Markovich*, at 11 n. 25).

lyn's July 10, 2000 and subsequent eye blinking episodes. *Id.*

On July 22, 2005, the Special Master issued a decision finding that the first symptom or manifestation of onset of Ashlyn's seizure disorder occurred on July 10, 2000, the date of her vaccinations and on which she had an initial eye blinking episode. Since Petitioners filed their claim on August 29, 2003, fifty days after the three-year limitations period expired, however, the Special Master ruled that the United States Court of Federal Claims did not have jurisdiction to consider the merits of the Petition. *Id.* at 2.

On August 19, 2005, Petitioners timely filed a Motion for Review of the Special Master's July 22, 2005 decision, pursuant to Appendix B, Rule 23 of the United States Court of Federal Claims. Therein, Petitioners assert that their claim was filed within the 36–month limitations period, because the limitations period did not commence until August 30, 2000, the date that Ashlyn first was diagnosed by a licensed physician as having experienced a seizure. Petitioners contend that the Special Master incorrectly interpreted Dr. Corbier's expert opinion to fix with certainty the July 10, 2000 repeated eye blinking episode as the onset of Ashlyn's seizure disorder. *See* Pet. Mem. of Objections at 1–2. Petitioners also contend that the July 10, 2000 repeated eye blinking episode was not a "symptom" of a seizure disorder and that the Special Master erred in relying on "hindsight." *Id.* at 2–4. In addition, Petitioners take issue with the Special Master's gratuitous remark that if this case were allowed to proceed it would *"open the door to illegitimate claims." Id.* at 4–5 (emphasis added). Finally, Petitioners argue that the Special Master misconstrued *Brice v. Sec'y Health & Human Servs.,* 240 F.3d 1367 (Fed.Cir.2001); *Goetz v. Sec'y Health & Human Servs.,* 45 Fed.Cl. 340 (Fed.Cl.1999), *aff'd,* 4 Fed.App'x. 827 (Fed.Cir.2001); and *Childs v. Sec'y Health & Human Servs.,* 33 Fed.Cl. 556 (Fed.Cl.1995). *Id.* at 5–6.

On September 19, 2005, the Government filed a Response. Accordingly, these issues are now ripe for review by the United States Court of Federal Claims. *See* 42 U.S.C. § 300aa–12(e).

## DISCUSSION

### A.  Standard Of Review.

Congress requires that the United States Court of Federal Claims analyze conclusions of law made by a Special Master under the Vaccine Act *de novo, i.e.,* pursuant to a "not in accordance with law" standard. *See* 42 U.S.C. § 300aa–12(e)(2)(B); *see also Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1277 (Fed.Cir.2005) ("Under the Vaccine Act, the [United States] Court of Federal Claims reviews the special master's decision to determine if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.") (internal quotations omitted). The "not in accordance with law" standard is applicable where there is dispute over statutory construction or other legal issues. *See Saunders v. Sec'y Dep't of Health & Human Servs.,* 25 F.3d 1031, 1033 (Fed.Cir.1994) (quoting *Munn v. Sec'y Dep't of Health & Human Servs.,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992)); *Hines v. Sec'y Dep't of Health & Human Servs.,* 940 F.2d 1518, 1527 (Fed.Cir.1991).

Factual findings of a Special Master should not be set aside unless they are held to be arbitrary and capricious or a Special Master has acted in a manner evidencing an abuse of discretion. *See* 42 U.S.C. § 300aa–12(e)(2)(B); *see also Turner v. Sec'y of Health & Human Servs.,* 268 F.3d 1334, 1337 (Fed.Cir.2001). The United States Court of Appeals for the Federal Circuit, recognizing that "no uniform definition of this standard has emerged," has instructed the court that the decision of a Special Master may be found to be "arbitrary and capricious," but only if there has been reliance:

> on factors which Congress has not intended [the special masters] to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines,* 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77

L.Ed.2d 443 (1983)) (discussing a similar standard of review for agency rulemaking under the Administrative Procedure Act).

Discretionary rulings are reviewed under an "abuse of discretion standard." *Munn,* 970 F.2d at 870 n. 10; *see also Turner,* 268 F.3d at 1337.

## B. The Relevant Statute Of Limitations.

For vaccines listed in the Vaccine Injury Table[8] and administered after October 1, 1988 ("post-Act"), the Vaccine Act provides:

> [I]f a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months *after the date of the occurrence of the first symptom or manifestation of onset* or of the significant aggravation of such injury.

42 U.S.C. § 300aa–16(a)(2) (emphasis added). The starting point for a statute of limitations analysis, therefore, requires identification of the date of the occurrence of either (a) the first symptom or (b) manifestation of onset or of the significant aggravation of such injury.[9] *Id.; see also Shalala v. Whitecotton,* 514 U.S. 268, 274, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995) ("[T]he symptom or manifestation occurring after the vaccination must be evidence of the table injury's onset[.]").

Since the Vaccine Act's statute of limitations is an explicit condition of the waiver of sovereign immunity by the United States, the United States Court of Appeals for the Federal Circuit has instructed the court to be "careful not to interpret a waiver in a manner that would extend the waiver … beyond that which Congress intended." *Brice,* 240 F.3d at 1370 (quoting *Stone Container Corp. v. United States,* 229 F.3d 1345, 1352 (Fed. Cir.2000) (internal quotation omitted)). Our appellate court also has clarified that equitable tolling is not available for claims arising under the Vaccine Act. *See Brice,* 240 F.3d at 1374 (holding that equitable tolling is not available in post-Act cases and explaining that it is "inconsistent with the existing statutory scheme"); *see also Weddel v. Sec'y of Health & Human Servs.,* 100 F.3d 929, 931–932 (Fed.Cir.1996) (holding that equitable tolling is not available in pre-Act cases).

## C. The Court's Resolution Of Petitioners' Motion For Review.

### 1. The Special Master's Finding That July 10, 2000 Was The Date Of The "First Symptom Or Manifestation Of Onset" Is Not Arbitrary Or Capricious.

■ Petitioners challenge the Special Master's determination that Dr. Corbier concluded that Ashlyn's July 10, 2000 repeated eye blinking episode was the onset of a seizure disorder. *See* Pet. Mem. of Objections at 1–2. Petitioners argue that "Dr. Corbier testified that it was his opinion that the onset date of Ashlyn's seizure disorder was August 30, 2000." *Id.* at 1 (citing TR at 9). The court disagrees.

The court presumes that Petitioners' argument is based on Dr. Corbier's testimony that "on August 30th, 2000, the patient had a generalized tonic-clonic seizure that lasted at least 20 minutes. So as of that date, the patient did definitively have documented seizures and that went beyond August 30th, 2000." TR at 9. To interpret this as an opinion that the onset of Ashlyn's seizure disorder was August 30, 2000 misconstrues Dr. Corbier's testimony, particularly when viewed in its entirety. For example, Dr. Corbier testified that Ashlyn's July 10, 2000 eye blinking episode was the result of a cerebral dysfunction and is "linked to" the August 30, 2000 seizure. *See* TR at 10. Dr. Corbier also testified that, in his professional judgment, July 10, 2000 was the "time line of when something first started [that] may have [precipitated the July] 10th [incident] … was due to some type of cerebral dysfunction, and then the results culminated in her

---

8. The DTaP, IPV, and Hib vaccinations are listed on the Vaccine Injury Table. *See* 42 C.F.R. § 100.3(a) (2005).

9. "The term 'significant aggravation' means any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4).

having a seizure ... on August 30th." [10]  *Id.* And, as Dr. Corbier explained:

> In terms of timing, it appears like there was some type of precipitating event in this case with the vaccine and on that same day you have the eye blinking episodes, irregardless of whether the eye blinking turned out to be some type of cerebral dysfunction or little seizure ... [a]nd that they progressed on August 30th to a full-blown seizure.

*Id.* at 14.

In addition, Dr. Corbier explained that Ashlyn's July 10, 2000 eye blinking episode was an "objective symptom" of a seizure disorder.[11]  *Id.* at 19, 25. Moreover, in response to the Special Master's question at the Onset Hearing about whether "the first symptom occurred with the eye blinking episodes that were noted on July 10th[,]" Dr. Corbier responded affirmatively: "Yes, I think there was some type of dysfunction of some sort that likely started on July 10th, leading to a documented seizure." *Id.* at 19. Later in his testimony, Dr. Corbier advised the Special Master that "the eye fluttering and seizure disorder are both symptoms of a single process caused by an insult to the brain at about the time of the vaccinations." *Id.* at 25. Accordingly, the Special Master correctly concluded that: "Dr. Corbier made clear that even though he could not have said with absolute certainty on July 10, 2000, that Ashlyn had a seizure disorder, he was able to testify that problematic neurological symptoms were present." *Markovich,* at 19.

For these reasons, the court has determined that the Special Master's finding that the date of the onset was July 10, 2000 was not arbitrary or capricious.[12]

## 2. The Special Master Did Not Abuse Her Discretion In Relying On Expert Testimony Based On "Hindsight."

█ At the Onset Hearing, Dr. Corbier acknowledged that "hindsight is very important, in the sense that ... the full-fledged seizures started on August 30th, and *looking back* ... the eye blinking episodes had been seizures." TR at 12–13, 23 (emphasis added). Petitioners take issue with the Special Master's reliance on Dr. Corbier's opinion for this reason. *See* Pet. Mem. of Objections at 3–4; *see also* TR at 12–13, 23.

The court has not identified any text in the Vaccine Act or decisions of the United States Court of Appeals for the Federal Circuit that address this issue, although the United States Court of Federal Claims has directly considered this evidentiary consideration from different perspectives. *Compare Brice v. Sec'y Dep't of Health & Human Servs.,* 36 Fed.Cl. 474, 477 (Fed.Cl.1996) (observing, without citation, that Congress was aware that "a petitioner typically will recognize that a particular symptom constitutes the first symptom or manifestation of the onset of a certain injury only with the benefit of hindsight, after a doctor makes a definitive diagnosis of the injury") *with Setnes v. United States,* 57 Fed.Cl. 175, 180 (Fed.Cl.2003) (criticizing a Special Master's reliance on an expert's opinion that was "the product of a

---

**10.** Dr. Corbier initially misstated the date of the repeated eye blinking episode, but corrected the record to identify the correct date, July 10, 2000. *See* TR at 10.

**11.** Petitioners contend that the repeated eye blinking episode is not a "symptom" of Ashlyn's seizure disorder. *See* Pet. Mem. of Objections at 2–3. Petitioners define a "symptom" as "any subjective evidence of a disease or of a patient's condition" and argue that the eye blinking episode was neither subjective evidence nor objective evidence of a neurological disorder, disease, or condition. *Id.* (quoting Dorland's). As discussed herein, the court is bound by this precedent, not a medical dictionary. See *infra* Discussion, Part (C)(3), at 10–11.

**12.** Petitioners also object to the Special Master's statement that:

> [P]etitioners need not understand the significance of a first symptom, the symptom merely must be manifest. To hold otherwise would open the door to many who would conveniently argue that while they observed certain activity shortly after vaccination that was explained to be the first symptom or manifestation of an onset of an injury, because they lack medical training, they failed to recognize those first symptoms as the manifestation of an injury.

*See* Pet. Mem. of Objections at 4–5 (referencing *Markovich,* at 23). Although this statement was entirely gratuitous and not justified by any evidence in the record, the court holds that it is not grounds for reversal. *See Turner,* 268 F.3d at 1337.

retroactive evaluation and enjoyed the benefit of hindsight," because the expert "had the fully assembled puzzle in front of him, and when taking the puzzle apart, opined that the pieces he was taking apart must have come from the puzzle").

The *Setnes* court was particularly concerned with the expert's hindsight diagnosis because it was "plainly inconsistent with . . . contemporaneous medical evaluations." *Setnes*, 57 Fed.Cl. at 180. Unlike *Setnes*, the record in this case does not include any contemporaneous medical evaluations of Ashlyn between July 10, 2000 and August 30, 2000. Accordingly, the court determines that the Special Master did not abuse her discretion in relying on Dr. Corbier's conclusions, notwithstanding the benefit of "hindsight."

3. **As A Matter Of Law, The Statute Of Limitations Runs From The First Symptom Or Manifestation Of The Onset, "Even If A Petitioner Reasonably Would Not Have Known At The Time That The Vaccine Had Caused An Injury."**

In the alternative, Petitioners argue that the repeated eye blinking episode on July 10, 2000 cannot be interpreted as the onset of Ashlyn's seizure disorder, because they "were never of the opinion that the eye blinking was anything other than their child being tired." Pet. Mem. of Objections at 2.

The United States Court of Appeals for the Federal Circuit, however, has held that the statute of limitations in Vaccine Act cases "begins to run upon the first symptom or manifestation of the onset of injury, even if the petitioner reasonably would not have known at the time that the vaccine had caused an injury." *Brice*, 240 F.3d at 1373; *see also Goetz v. Sec'y of Health & Human Servs.*, 45 Fed.Cl. 340, 341 (Fed.Cl.1999) ("[I]t is clear that Congress intended the cause of action in a Vaccine Injury Table case to accrue upon occurrence of the first symptom of an injury, not upon the first identification of a link between the injury and the vaccination."). Because applicable precedent does not require that a petitioner appreciate or recognize that a symptom or manifestation of the onset was caused by a vaccine, but only that the symptom or manifestation occur, the Special Master was correct in finding that:

> It is not relevant to the onset query that the parents were unaware that the blinking episodes were a neurological symptom that served as the precursor to the seizure that Ashlyn would experience on August 30, 2000. What is relevant to the present discussion is that the parents were aware that the blinking episodes began on July 10, 2000, and continued until the August 30, 2000 seizure.

*Markovich*, at 17–18.

Petitioners counter that, "although factually dissimilar[,]" the rationale in *Setnes* should govern in this case. Pet. Mem. of Objections at 3–4. The *Setnes* court held that the onset of a petitioner's autism was not the date that the petitioner began exhibiting behavior consistent with autism, *e.g.*, temper tantrums, staring, but instead, the date on which the petitioner's autism "became evident." *Setnes*, 57 Fed.Cl. at 181. In determining that the statute of limitations should not begin to run prior to a medical diagnosis, the United States Court of Federal Claims remanded that case to the Special Master and explained:

> As distinguished from other medical conditions, . . . the beginning stage of autism cannot be reduced to a single, identifiable symptom. Many of the initial 'symptoms' are subtle and can easily be confused with typical child behavior. Where there is no clear start to the injury, such as in cases involving autism, prudence mandates that a court addressing the statute of limitations not hinge its decision on the 'occurrence of the first symptom.'

*Id.* at 179 (citations omitted).[13]

Although the *Setnes* decision concerned autism, it suggested an interpretation of the Vaccine Act statute of limitations that was

---

13. The United States Court of Appeals for the Federal Circuit has not had an occasion to review *Setnes*, because the case has been stayed pending a decision on causation. *See Autism,*

*General Order # 1,* 2002 WL 31696785, 2002 U.S. Claims LEXIS 365 (Fed.Cl.Spec.Mstr. July 3, 2002).

faithful to precedent, but also recognized the important need for the requisite medical certainty to trigger the statute of limitations, particularly in cases involving children. *Id.; see also Brice*, 240 F.3d at 1376 (Newman, J., dissenting) (warning that a rigid approach to the statute of limitations "defeats the Act's purpose to provide a non-adversarial and equitable governmental response to vaccine-related injury"); Katherine Marie Bulfer, Comment, *Childhood Vaccinations And Autism: Does The National Childhood Vaccine Injury Act Leave Parents Of Children With Autism Out In The Cold With Nowhere To Go?*, 27 Campbell L. Rev. 91, 101 (2004) (endorsing the *Setnes* court's concern with subtle symptoms and suggesting that more weight be accorded to contemporary medical evaluations).

The court is persuaded by the logic of *Setnes* and suggests, if the United States Court of Appeals for the Federal Circuit has occasion to review the instant decision, that a more definitive and equitable manner of determining the time certain for the commencement of the statute of limitations be considered, by modifying *Brice* as follows: "in Vaccine Act cases, the statute of limitations begins to run upon identification of the first symptom or manifestation of the onset of injury [by a licensed physician]." [14]

### 4. The Special Master Did Not Misconstrue Applicable Precedent.

Finally, Petitioners argue that the Special Master incorrectly relied on *Brice*, 240 F.3d 1367; *Goetz*, 45 Fed.Cl. 340; and *Childs*, 33 Fed.Cl. 556, because the injuries in those cases were "clearly apparent" and, thus, different from the facts of this case. *See* Pet. Mem. of Objections at 5. The Special Master, however, cites these cases for propositions that transcend Petitioners' factual distinction.

The Special Master cites *Brice* for the principle that equitable tolling is not available in Vaccine Act cases. *See Markovich*, at 20. The *Brice* decision extends to all cases under the Vaccine Act, as the holding concerns statutory interpretation rather than an adjudication of a factual dispute. *See Brice*, 240 F.3d at 1372–1374 ("We determine only that equitable tolling is inconsistent with the existing statutory scheme."). Therefore, whether Ashlyn's injury was known to her parents is irrelevant because, as a matter of law, equitable tolling is never available in Vaccine Act cases.

The Special Master also cites *Brice* for the principle that a court may not interpret a waiver of sovereign immunity in a way that extends the waiver beyond that which Congress intended. *See Markovich*, at 13, 23. Simply because the facts in this case are distinguishable from the facts in *Brice* does not relieve the court of its obligation to strictly construe the Vaccine Act's waiver of sovereign immunity.

In addition, the Special Master cites *Goetz* and *Childs* for the holding that the 36–month limitations period begins on occurrence of the first symptom or manifestation of an injury, not the first identification of a link between the symptom or manifestation and the injury. *See Markovich*, at 20–21. Although the *Goetz* and *Childs* decisions preceded the United States Court of Appeals for the Federal Circuit's decision in *Brice*, the later case simply reaffirmed the holding in *Goetz* and *Childs*. *See Brice*, 240 F.3d at 1373 ("[T]he statute of limitations here begins to run upon the first symptom or manifestation of the onset of injury, even if the petitioner reasonably would not have known at that time that the vaccine had caused an injury."). As such, the Special Master correctly cited *Goetz* and *Childs*.

Accordingly, the Special Master did not misconstrue *Brice, Goetz,* or *Childs*, notwithstanding the factual distinction that Petitioners proffer.

### CONCLUSION

Having determined that the onset of Ashlyn's seizure disorder was July 10, 2000, the Special Master correctly concluded that the United States Court of Federal Claims does

---

14. In recent years, Congress has considered amendments to the Vaccine Act, including an extension of the limitation periods. *See, e.g.,* H.R. 1297, 109th Cong., at Sec. 7 (2005) (extending the statute of limitations to six years and permitting petitions previously dismissed as being untimely to be re-filed within two years); H.R. 1349, 108th Cong., at Sec. 7 (2003) (same).

not have jurisdiction to entertain Petitioners' claim. The Vaccine Act states that a Vaccine Injury Table claim, relating to a post-Act vaccine, must be filed within three years of the date of the first symptom or manifestation of onset. *See* 42 U.S.C. § 300aa–16(a)(2). In this case, Petitioners were required to file a claim for Ashlyn's seizure disorder by July 10, 2003. Petitioners, however, did not file their claim until August 29, 2003—fifty days beyond the limitations period. As such, the Special Master correctly dismissed the Petition.

For the foregoing reasons, Petitioners' Motion for Review is **DENIED**. The Clerk of the Court is hereby directed to enter judgment in accordance with this Memorandum Opinion.

**IT IS SO ORDERED.**